1  Patrick Baylis - V 31394
2  C.S.P. Solano
3  P.O. Box 4000
4  Vacaville, CA. 95696

5
6  Petitioner. In Pro Pre

7

8        IN THE UNITED STATES DISTRICT COURT
9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  Patrick Baylis,              No. C07-5791 CRB
12  Petitioner.                  PETITIONER'S TRAVERSE TO
                                 ANSWER
13  V.
14  James Tilton,
15  Respondent (s).

16                        I.
17  Petitioner admits that he is in State Custody 28 U.S.C.
18  2254 as stated by Respondent. However Petitioner
19  Contends that his Custody is "UnLawful" for
20  the reasons set forth herein and in the
21  Petition For Writ of Habeas Corpus and Suppo-
22  rting exhibits. Petitioner denies each and every
23  allegation of the Answer and re-affirms that his
24  confinement is in violation of the Constitution.

25
26
27
28

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE     1

STATEMENT OF FACTS     2

The Prosecution's Case     2

The Defense Case     6

STANDARD FOR REVIEW     8

ARGUMENT     9

I. THE TRIAL COURT COMMITTED ERROR OF FEDERAL CONSTITUTIONAL DIMENSION WHEN IT DENIED PATRICK'S MOTION TO SUBSTITUTE MR. HOVE AS HIS RETAINED ATTORNEY OF CHOICE.

II. THE TRIAL COURT HAD A DUTY TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF THEFT IN COUNT 8.     30

CONCLUSION     33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court of Appeal described the procedural posture of the case as follows.

1  In October 2003, the District Attorney for the County of Alameda
2  filed a Second amended information alleging that defendant
3  Patrick Baylis committed four counts of rape (Pen. Code,
4  261, Subd. (a)(2); Count 1-4), one count of penetration with
5  a foreign object (289; Count 5), one count of forcible oral
6  copulation (288a, Subd. (c); Count 6), one count of kidnapping
7  with the intent to commit rape or oral copulation
8  (208, Subd. (d); Count 7), and one count of robbery (211-
9  Count 8). As to counts one through six, it was
10 alleged that defendant kidnapped the victim and
11 that the movement of the victim substantially
12 increased the risk to her (667.61, Subd. (d)(2) and
13 (e)(1) and that defendant personally use a firearm
14 (667.61, Subd. (e)(4), 12022.3) As to counts seven and
15 eights it was alleged that defendant personally used
16 a firearm. (12022.5)... A Jury found defendant guilty
17 on all counts and, In April 2004, the trial court
18 imposed a total prison term of 44 years to life.
19
20 The Court of Appeal affirmed the conviction.
21 On September 13, 2006, the California Supreme Court denied review.
22 On November 14, 2007, Petitioner filed a Petition for
23 Writ of habeas corpus. On February 12, 2008,
24 this Court issued an order to Show cause.
25
26
27
28

1

The court of Appeal described the facts of the offense as follows:

## The Prosecution's Case

In the morning of February 23, 1997, as the victim was walking to work, a man she described as black and heavyset walked toward her. He grabbed her arm, put his hand over her mouth and put a gun to her cheek. He told her not to scream or he would kill her, and he told her to keep walking.

They walked through a parking lot and he covered her face with her jacket. The assailant forced her into a car and drove her to an apartment in Hayward. He led her to a walk-in closet, covered her eyes with a t-shirt, and told her to take off her clothes. He forced her to have intercourse in the closet and on a mattress in another room, and holding a gun to her head, made her orally copulate him. As the assailant handed the victim her clothes, she heard him going through her pockets. She later discovered that approximately seventeen dollars were missing. The assailant told the victim that he should just kill her, led her back to the mattress, and forced her to have intercourse again.

They left the apartment. The assailant drove for a while and told the victim to get out of the car. She contacted the police, describing her assailant as a black male in his early 30's, five feet five inches tall, about 200 pounds, with a full beard and closely cut hair.

2

1  In a photo lineup, the victim picked out defendant's
2  brother Rodney Baylis, as her assailant. one night
3  about a month later, the victim saw the car her
4  assailant had driven parked across the street from
5  her house. She saw three men approach the
6  Car and told Pinkney, with whom She was living
7  that one of the men was her assailant. They
8  Called the police, who arrived soon afterwards
9  and drove the victim to where the car had
10 been stopped by other officers. The victim
11 identified defendant as her assailant. one of the
12 officers said She was Confusing defendant with his
13 brother, but the victim never changed her mind.
14 Because Detective Daley had identified Rodney as the Primary
15 suspect in the rape, defendant was not taken in to custody.
16 Another officer who was present during the identification
17 admitted that he falsely wrote in his report that the
18 victim did not make an identification. He testified that
19 Daley asked him to write a supplemental report
20 falsely stating that the victim reported that the
21 person the police had detained looked like the
22 assailant but that the assailant was actually
23 shorter (defendant is over six feet tall and Rodney is
24 approximately five and a half feet tall). A couple
25 of days later the victim told Daley that defendant
26 was her assailant; he corrected her, admonishing
27 that her assailant was actually the defendant's
28 brother, whom she had identified in the photo
   line-up.

1 Rodney was charged with the rape, along with
2 separate sexual assaults in Alameda and Oakland.
3 At the preliminary hearing in August 1997, the victim
4 identified Rodney as the person who had raped her.
5 However, she had concerns about the accuracy of her
6 identification. After the hearing, she told Pinkney that
7 the man she identified was not her assailant. When she
8 made the identification during the hearing, she trusted Daley's
9 judgment more than her own.
10 In June 1999, DNA analysis of a semen sample on the
11 victim's underpants excluded Rodney. Defendant and the
12 victim's boyfriend, Robert Pinkney, could not be excluded
13 as sources of the semen. Assuming Robert Pinkney was
14 one sources of the semen, the odds of a person taken
15 at random being another contributor were approximately
16 one in 690 billion Caucasian males and one in
17 10 billion African-American males. Not assuming
18 that Robert Pinkney was a source of the semen,
19 the odds of a person taken at random being
20 one of the contributors was one in 8,200
21 Caucasian males and one in 890 African-
22 American males.
23 Based on information obtained from a car dealer-
24 ship, the police determined that the car the assailant
25 drove matched the description of a 1996 Hyundai
26 registered to a Cathrell Coolston. The investigation
27 also led the police to an apartment on Vermont
28 street in Hayward, which the victim subsequently

1  Identified as the location where She was raped. The
2  victim's and defendant's fingerprints were found in the
3  Vermont Street apartment; Rodney's were not. Golstone
4  lived in the Vermont Street apartment but moved
5  out before February 23, 1997. Golston previously was
6  in a romantic relationship with defendant. The
7  romantic relationship ended in December 1996,
8  but she continued to allow defendant to drive
9  her car and defendant had keys to the Vermont
10 Street apartment. Rodney had never been to the
11 apartment.

12
13 (See. EXHIBIT (A)
14 (See. EXHIBIT (C)

15
16
17
18
19
20
21
22
23
24
25
26
27
28

5

# The Defense Case

Defendant challenged the victim's identification. The parties stipulated that a victim-witness assistance counselor would testify that the victim never told her that Rodney was not her assailant and did not express any doubt about the identification of Rodney. Similarly, defendant's sister testified that she saw the victim at Rodney's preliminary hearing, and the victim saw defendant and did not say anything about him.

Defendant testified he denied raping, kidnapping, or having any contact with the victim. He did admit that he had a key to Golston's apartment on Vermont Street and that he drove her car with her permission. The night before the victim was kidnapped and raped, the defendant picked up Rodney from a Bart station and gave him Golston's car as well as the keys to the apartment on Vermont Street. Later that night, defendant and two friends, Mike and Tanya, went to a bowling alley in Hayward. Afterward, they went to the Vermont Street apartment, and defendant had sex with Tanya. Defendant left the apartment early the next morning. In February 1997, defendant's hair was about three or four inches long, not closely cut. He had a gotee but not a full beard. He went to the police department voluntarily after he heard the police were looking for Rodney. He was interviewed by

1    two detectives but Lucs not arrested.

2

3    See EXHIBIT (B)

# STANDARD FOR REVIEW

This Court reviews the State Court's ruling under a highly deferential" standard imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Woodford v. Visciotti, 537 U.S. 19, 24 (2002)(per curiam). A federal Court has no authority to grant habeas relief unless the State court's ruling was contrary to, or involved an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. 2254(d)(1) In all Criminal prosecutions, the accused shall enjoy the right to have the Assistance of counsel for his defence. (U.S Const 4th Amend.) Article I Section 15, of the California Constitution provides in part: The defendant in a Criminal Cause has the right to have the assistance of Counsel for the defendant defense and to be personally present with counsel." A criminal defendant has the due process right to be defended by retained counsel of his or her choice. See United States v. Rewald (9th cir. 1989) 889 F.2d 836, 856 [right to counsel of choice is limited to defendant who can privately retain counsel] At issue here is whether Petitioner was denied that right.

8

# ARGUMENT

## I.

### The Trial Court Committed Error of Federal Constitutional Dimension When It Denied Patrick's Motion to Substitute Mr. Hove as His Retained Attorney of Choice.

The Respondent contends that the trial Court found a conflict of interest because Hove had represented petitioner's brother Rodney Baylis and because the strategy of the defense in this case was likely to be that Rodney rather than petitioner had committed the crimes. The Court found that the conflict of interest had not been effectively waived and denied the request to substitute in Mr. Hove.

While acknowledging that the California Courts generally have not followed the federal Courts' "paternalistic treatment" of the defendant," as exemplified by Wheat, the trial Court below decided that "deference to federal law" was appropriate in the instant case (CT 347.) As Patrick will discuss post, even under the federal Courts' approach, the trial Court's order denying Patrick's Motion to Substitute Mr. Hove as his retained Counsel of record was erroneous. Wheat is readily distinguishable from the instant case. The trial Court's order resulted in a denial of Patrick's Sixth and Fourteenth Amendment rights. The majority opinion in Wheat described "the question raised in this case" as the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has represented other defendants charged in the same criminal conspiracy." Wheat. Supra, - 486 U.S. at p. 159.)

The question presented in Wheat was, therefor, quite different from the question presented in the instant case. No criminal conspiracy was alleged in either the instant case or the prosecution of Rodney Baylis. Richard Hove did not represent Rodney during the time he was charged with the Hayward offenses that later were charged against Patrick in the instant case, as the trial court acknowledged: "It should be noted that Mr. Hove did not represent Mr. Rodney Baylis on the case now before the court, to wit, the charges stemming from the Hayward sexual assault (CT 342.)

Wheat was a case involving conspiracy to possess in excess of 1,000 pounds of marijuana with the intent to distribute it. There were a number of codefendant, including Mark Wheat, Juvenal Gomez-Barajas and Javier Bravo. Wheat acted "primarily as an intermediary in the distribution ring; he received and stored large shipments of marijuana at his home, then distributed the marijuana to customers in the region." (Wheat, supra, 486 U.S. at pp. 154-155.) Both Gomez-Barajas and Bravo were represented by attorney Eugene Iredale. Gomez-Barajas had been tried first and was acquitted on charges which overlapped with those against Wheat; in order to avoid a second trial on other charges, Gomez-Barajas offered to plead guilty to tax evasion and illegal importation of merchandise. (Id. at p. 155.) Prior to Wheat's trial, Bravo pled guilty to one count of transporting

2,400 pounds of marijuana. (Wheat, supra, 486 U.S. at p. 155.) After the entry of Bravo's guilty plea, Mr. Iredale notified the district court that he had been contacted by Wheat, who had asked Iredale to serve as his trial counsel as well. At the commencement of Wheat's trial, the district court had not accepted Gomez-Barajas's plea; Gomez-Barajas was "thus free to withdraw" his guilty plea and proceed to trial." (Ibid.) The Government opposed Wheat's proposed substitution of counsel on the grounds that "Iredale's representation of Gomez-Barajas and Bravo created a serious conflict of interest." (Wheat, supra, 486 U.S. at p. 155.) First, the district court had not yet accepted the plea and sentencing arrangement negotiated between Gomez-Barajas and the Government, so there was the possibility that Gomez-Barajas would withdraw that plea if the plea was rejected by the court. In that event, Gomez-Barajas would then be faced with the prospect of representation by Iredale, who--if he also were Wheat's attorney--"would be prevented from cross-examining [Wheat] and thereby from effectively representing Gomez-Barajas"; it was expected that the Government would call Wheat as a witness in any trial of Gomez-Barajas. (Id. at pp. 155-156.) Second, the Government argued that Iredale's prior representation of Bravo would put Iredale in an "untenable" position, because the Government sought to present Bravo as a witness against Wheat, in

11

exchange for modifying its position at the time of Bravo's sentencing; therefore "ethical proscriptions would forbid [Iredale] to cross-examine Bravo in any meaningful way. By failing to do so, he would also fail to provide Wheat with effective assistance of counsel." Wheat, supra, 486 U.S. at p. 156) Nevertheless, Wheat, Bravo and Gomez-Barajas all waived their rights to conflict-free counsel and "agreed to allow Iredale to represent Wheat and to waive any future claims of conflict of interest." (Id. at pp. 156-157) After first noting that it" was unfortunate that [Wheat] had not suggested the substitution sooner, rather than two court days before the commencement of trial," the district court found that an irreconcilable conflict of interest exists, which could not be waived; therefore, the court denied Wheat's request to substitute Iredale as his attorney of record. Wheat, supra, 486 U.S. at p. 157) Wheat was thereafter convicted of conspiracy to possess more than 1,000 pounds of marijuana with intent to distribute, as well as five other counts, after proceeding to trial with his original attorney. (Ibid.) The Ninth Circuit Court of Appeals affirmed Wheat's conviction. (Wheat, supra, 486 U.S. at p. 157) The United States Supreme Court granted certiorari, because the courts of Appeals were in substantial disagreement about when a district court may override a defendant's waiver of his attorney's conflict of interest." (Id. at p. 158.) The high court majority held that, based on

12

the situation presented to the district court in
Wheat, that Court's refusal to permit the substitution
of counsel was within its discretion and did not
violate Wheat's sixth Amendment rights. (Wheat, supra,
486 U.S. at p. 164). The majority's central holding was
that a federal district Judge is entitled to "substantial
latitude in refusing waivers of conflicts of interest not
only in those rare cases where an actual conflict
may be demonstrated before trial but in the more common
cases where a potential for conflict exists which may
not burgeon into an actual conflict as the trial
progresses". (Wheat, supra, 486 U.S. at p. 163) The District
court must recognize a presumption in favor of the
defendant's counsel of choice, but that presumption
may be overcome not only by a demonstration of
actual conflict but by a showing of a serious
potential for conflict. The evaluation of the facts and
circumstances of each case under this standard must
be left primarily to the informed judgment of the
trial court. (Wheat, supra, 486 U.S. at p. 164) In explain-
ing its reasoning, the majority stated that while the
right to select and be represented by one's preferred
attorney is comprehended by the sixth Amendment,
the essential aim of the Amendment is to guaran-
tee an effective advocate for each criminal defendant
rather than to ensure that a defendant will inexorably
be represented by the lawyer whom he prefers."
Wheat, supra, 486 U.S. at p. 159) The court noted that

13

a trial court must make such ruling "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly," and the "likelihood and dimensions" of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." (Id. at pp. 162-163) The Supreme Court noted that not only are there various "imponderables" which are difficult for a lawyer to assess and convey to a criminal defendant untutored in the niceties of legal ethics," but "the willingness of an attorney to obtain such waivers from his client may bear an inverse relation to the care with which he conveys all the necessary information to them." (Id. at p. 163) In holding that the district court must be allowed substantial latitude in refusing waivers of conflicts of interest," the Supreme Court noted that, in Wheat: (1) the district court was confronted "not simply with an attorney who wished to be represented two coequal defendants in a straight-forward criminal prosecution; rather, Iredale proposed to defend three conspirators of varying stature in a complex drug distribution scheme;" (2) the Government intended to call Bravo as a prosecution witness at Wheat's trial; (3) if the Government tied certain deliveries of marijuana by Bravo to Wheat, then Iredale, "because of his prior representation of Bravo, would have been

14

unable to ethically provide vigorous cross-examination" of Bravo, and (4) because Iredale had also represented Gomez-Barajas and succeeded in obtaining a verdict of acquittal for him, if the plea bargain which was subsequently entered into between Gomez-Barajas and the Government fell apart, Wheat's probable testimony at the resulting trial of Gomez-Barajas would create an ethical dilemma for Iredale from which one or the other of his clients would likely suffer." (Wheat, supra, 486 U.S. at pp. 163-164) None of the circumstances presented in Wheat were present in the case before this court. First, and perhaps most significantly, Mr. Hove was not seeking to represent multiple criminal defendants in the same proceeding. Rather, Mr. Hove was seeking to represent Patrick in a case in which he had not previously represented Rodney and after his formal representation of Rodney had been concluded. Unlike in Wheat, there was no simultaneous representation of more than one defendant in the same proceeding present here. (See RT 5-2-2003) 3-4.) Second unlike in Wheat, where the Government intended to call Bravo as a witness at Wheat's trial, in the case at bar the prosecutor did not state that he intended to call Rodney as a witness at Patrick's trial, nor was there any reason to think that he would, and in fact he did not. Third, the prosecution below did not indicate

15

1   that it would seek to tie certain illegal acts commit-
2   ted by Rodney to Patrick, which because of Mr.
3   Hove's prior representation of Rodney would have
4   prevented him from vigorously cross-examining
5   Rodney (who, as noted, was not likely to be called
6   as a prosecution witness in the first place.) Fourth,
7   nothing that would have arisen from Mr. Hove's
8   representation of Patrick was even remotely com-
9   parable to the ethical dilemma Mr. Iredale faced
10   with regard to the possibility that Wheat might
11   have to testify against the third defendant in that
12   case, Gomez-Barajas, if the latter's plea bargain
13   fell apart. Besides the absence of the aforementioned
14   factors, there is another important distinction between
15   the circumstances presented in Wheat and those presen-
16   ted here: the timing of the substitution motions. In
17   Wheat, following the entry of Bravo's guilty plea,
18   Mr. Iredale notified the court that he had been
19   contacted by Wheat to represent him in his case
20   as well, and the court set argument on the
21   substitution motion "just one day" before the sched-
22   uled start of [Wheat's] trial." (Wheat, supra, 486 U.S.
23   at p. 155.) Following argument on the substitution
24   motion, the district court noted that "it was unfortunate
25   that [Wheat] had not suggested the substitution sooner,
26   rather than two court days before the commencement
27   of trial." (Id. at p. 157.) The Supreme Court Major-
28   ity's determination that the district court did not

16

1  abuse its discretion was based, in part, on the timing
2  of Wheat's motion. The high court stated that the
3  motion was "made so close to the time of trial"
4  that the district court "relied on instinct and judgment
5  based on experience in making its decision. We do
6  not think it can be said that the court exceeded the
7  broad latitude which must be accorded it in making
8  this decision."(Wheat, Supra, 486 U.S. at p. 163.) By
9  contrast, in the case before this court, Mr. Hove first
10  appeared in court to orally inform the court of
11  Patrick's desire to substitute him as retained
12  counsel on record on November 27, 2002, which was
13  almost 10 months before the first day of trial, which
14  was on October 7, 2003. (CT 309, 569.) After various
15  court hearings and continuances, the written
16  substitution motion was filed on May 1, 2003, more
17  than five months before the start of trial. (CT 314-
18  317.) Any deference accorded to the trial court's
19  instinct" in Wheat because of the unexpected pre-
20  sentation of the substitution motion on the eve of
21  Wheat's trial should not be accorded to the trial
22  court here.

23
24  Contrary to the Trial Court's opinion, Allowing
25  Patrick His Retained Counsel of Choice, Under the
26  Circumstances Presented, Would Not Have Violated
27  Rodney's Right or Applicable Standards of Legal
28  Ethics.

17

1  Patrick acknowledges that a trial court has legitimate
2  interest in ensuring that criminal trials are conducted
3  within the ethical standards of the profession and
4  that legal proceedings appear fair to all who observe
5  them" (Wheat, supra, 486 U.S at p. 160.) The trial
6  court's granting Patrick's motion for substitution
7  of counsel would not have undermined that interest.
8  Patrick made it unequivocally clear that he wanted
9  Mr. Howe to represent him as his retained counsel
10 and that he was knowingly and intelligently
11 waiving any conflict of interest in such repre-
12 sentation, as the trial court itself found. (See-
13 CT 343- 345, 349 - 352; RT [6-2-2003] 5-15; RT [7-8-2003]
14 3-6.) Rodney also waive[d] any conflict of interest
15 regarding same." (CT 353.) As Patrick will explain,
16 the trial court was mistaken in its belief that more
17 specifically, a waiver of the confidentiality of
18 attorney-client communications between Rodney
19 and Mr. Howe- was needed from Rodney. The
20 trial court cited and quoted Rule 3-310 of the
21 Rules of Professional Conduct of the State Bar
22 of California (which it called the "Rules Of
23 Professional Responsibility"). (CT 345.) Under that
24 rule, an attorney "shall not, without the informed
25 written consent of each client: (1) Accept repre-
26 sentation of more than one client in a matter in
27 which the interests of the clients potentially
28 conflict; or (2) Accept or continue representation

18

of more than one client in a matter in which
the interests of the client actually conflict; or (3)
Represent a client in a matter and at the same time
in a separate matter accept as a client a person
or entity whose interest in the first matter is
adverse to the client in the first matter." (Rules-
Prof. Conduct, rule 3-310(c)) As the trial court noted,
the rule defines "informed written consent" as "the
client's or former client's written agreement to the
representation following written disclosure." (Rules-
Prof. Conduct, rule 3-310(A)(2), quoted in CT 345.)
Mr. Hove's proposed representation of Patrick at
trial in the instant case would not have contra-
vened the requirements of Rule 3-310. Momentarily
leaving aside the trial court's ruling that Rodney's
written waiver was inadequate, it is not even
clear that any written waiver was required. Rule
3-310 requires informed written consent only when
an attorney proposes to do one of the three
things listed therein (quoted above), Mr Hove did
not propose to do any of them. Specifically,
taking the three components of Rule 3-310(c)
in order, Mr. Hove did not seek to represent
"more than one client in a matter," regardless
of whether the matter involved a potential conflict
(Rules Prof. Conduct, rule 3-310(c)(1)) or an actual
conflict (Rules Prof. Conduct, rule 3-310(c)(2). The
only client he sought to represent in the instant

19

1  Case was Patrick. Even if "Matter" were broadly construed
2  to mean the Hayward offenses rather than just the
3  instant cases, Mr. Hove never represented Rodney concerning
4  the Hayward offenses. (RT [6-2-2003] 17; CT 342.) Mr. Hove
5  also did not propose to represent Patrick "at the same
6  time" he was representing Rodney (Rule Prof. Conduct, rule
7  3-310(C)(3)), for his representation of Rodney was finished.
8  (See ante, p. 41 & fn. 18.) Assuming arguendo that Mr. Hove's
9  proposed representation of Patrick fell into one of the
10 three categories specified in Rule 3-310(C) and that,
11 therefore, informed written consent of both clients was
12 required, Mr. Hove complied with this ethical requirement.
13 In Rodney's written declaration, signed under penalty of
14 perjury, he stated that he had been represented by Mr.
15 Hove and was originally charged with the offenses
16 then pending against Patrick, which had been dismissed
17 against Rodney. (CT 353.) Rodney stated in his declaration
18 that he understood that Patrick was seeking to have
19 Mr. Hove represent him and that he had been "advised
20 that a conflict of interest may exist with Mr. Hove
21 representing Patrick Baylis. I am aware of this and
22 hereby waive any conflict of interest regarding same.
23 (CT 353.) This declaration was sufficient to constitute
24 an intelligent and knowing written waiver of any
25 conflict which would arise as a result of Mr. Hove
26 representing Patrick in this matter. In finding Rodney
27 written waiver "to be wholly insufficient" (CT 347),
28 the trial court attached considerable weight to its finding

that Mr. Hove's representation of Patrick would somehow result in the waiver of Rodney's attorney-client privilege and of his protection against the disclosure of confidential communications between him and Mr. Hove. (See CT 346) The possibility has also been raised that Mr. Hove may be required to take the stand and reveal confidential communications that he had with Rodney concerning these charges" Ji ibid. [Rodney's written waiver made no mention of the possibility that the District Attorney may attempt to call Mr. Hove as a witness or that Mr. Hove may be forced to disclose otherwise privileged attorney-client communications made to Mr. Hove"] CT 347 [Mr. Hove may be called to testify in this case and could possibly be forced to disclose privileged communications"] The trial court was wrong on these points. All attorney-client communications between Mr. Hove and Rodney were absolutely confidential, and neither the court nor the prosecutor could force Mr. Hove to divulge any of those communications in court, either within or outside the presence of the jury. Mr. Hove had a duty to claim the attorney-client privilege if asked any questions about communications he had with Rodney during the course of their attorney-client relationship. (See Evid. Code, 954, 955.) Mr. Hove was required to maintain inviolate the confidence, and at every peril to himself, to preserve the secrets, of his client." (Bus. & Prof. Code 6068, Subd. (e)(1); See Rules Prof.

21

1  Conduct, rule 3-100(A).) In spite of this strong statutory
2  protection afforded to Rodney's confidential communications
3  with Mr. Hove, the trial court appeared to believe that
4  Rodney's written waiver of the conflict of interest would
5  somehow operate as a waiver of the attorney-client
6  privilege and that Rodney was ignorant of this fact.
7  The waiver makes no mention of the possibility that the
8  District Attorney may attempt to call Mr. Hove as a
9  witness or that Mr. Hove may be forced to disclose
10 otherwise privileged attorney-client communications
11 made to Mr. Hove. An attorney may not disclose
12 confidential attorney-client communications of a former
13 client [citation], unless specifically waived [citation].
14 Rodney's declaration does not contain a waiver of
15 the attorney-client privilege. The waiver is silent
16 as to the possibility that information that Mr. Hove
17 agined while representing Rodney may be used
18 to assist Patrick, to Rodney's possible detriment.
19 In sum, in contrast to Patrick Bayls' waiver,
20 Rodney's waiver contains no evidence that he is
21 aware of the drawbacks to waiving the conflict
22 of interest. (CT 346.) Patrick is aware of no
23 authority supporting the trial court's notion
24 that Mr. Hove could have been forced to disclose
25 confidential attorney-client communications with
26 Rodney merely by virtue of the conflict-of-interest waiver.
27 Surely the court was not implying that Mr. Hove would
28 need to use these confidential communications

1  With Rodney in order to competently represent
2  Patrick; no other attorney representing Patrick would
3  have access to those communications, let alone
4  be able to introduce evidence of them. The trial
5  court also opined that Rodney's written waiver was
6  deficient because Rodney "does not acknowledge the
7  possibility that his brother, Patrick, will seek to
8  inculpate him as the perpetrator of these offenses."
9  (CT346.) It is unclear why the trial court found this
10 relevant to the waiver issue. Any competent attorney
11 defending Patrick at trial would have tried to
12 convince the jury that Rodney might have been the
13 perpetrator, and not Patrick. Mr. Berger, who
14 ultimately represented Patrick at trial, did essen-
15 tially that at trial (see, for example, defense
16 closing argument at RT 80½; was it Rodney, Patrick,
17 or someone else all together? Can you say beyond
18 a reasonable doubt?) Moreover, even if Rodney's aware-
19 ness of his possible inculpation at Patrick's trial
20 were a prerequisite for finding his conflict waiver
21 adequate, Rodney had been through the experience
22 of his own trial, at which Mr. Hove sought to
23 convince the jury that Patrick was the perpetrator.
24 It could hardly have come as a surprise to him
25 that Mr. Hove would employ a similar strategy
26 at Patrick's trial, especially in light of the fact
27 that Jane Doe had previously identified Rodney
28 as the perpetrator. For the foregoing reasons,

1  the trial Court's denial of Patrick's motion to
2  Substitute Mr. Hove as his trial Counsel denied
3  him his right to be represented by retained
4  Counsel of Choice and to due process under
5  the Sixth and Fourteenth Amendments to the
6  United States Constitution. The trial Court, in its
7  ruling in the instant Case, addressed several State
8  appellate decisions which applied Wheat to various conflict
9  Situations involving privately retained attorneys. In this
10 part of the Argument, Mr. Baylis first discusses those
11 decisions and their implications for the instant Case,
12 then notes a California Supreme Court case, decided
13 during the pendency of this appeal, that applied Wheat
14 in the different context of a trial Court's removal of app-
15 ointed (not retained) Counsel. One of the first California
16 appellate Courts to Consider and apply the Supreme
17 Court's holding in Wheat was Alcocer v Superior Court
18 (1988) 206 Cal. App. 3d 951, Cited but neither discussed
19 nor distinguished by the trial Court below (CT 347).
20 In that Case, the appellate court (Second Appellate
21 District, Division Six) addressed the Question of Whether
22 a defendant in a criminal Case may Waive his right
23 to be represented by an attorney Who has no Conflict
24 of interest, "even though by doing so he may not
25 receive a fair trial." The Alcocer Court held that "he
26 May if he knowingly and intelligently Waives that
27 right." (Alcocer, 206 Cal. App. 3d at p. 955.)
28

one of the first California appellate Courts to Consider
and apply the Supreme Court's holding in Wheat was
Alcocer v. Superior Court (1988) 206 Cal. App. 3d 951. Cited
but neither discussed nor distinguished by the
trial court below (CT 347). In that Case, the app-
ellate court (Second Appellate District, Division
Six) addressed the question of whether a defendant
in a Criminal Case may waive his right to be repre-
sented by an attorney who has no conflict of interest,
even though by doing so he may not receive a fair
trial." The Alcocer Court held that "he may if he know-
ingly and intelligently waives that right. (Alcocer, 206 Cal.
App. 3d at p. 955) Ramiro Alcocer was charged with
lying to the grand Jury during the Course of an
investigation into a former Municipal Court Judge's use
of drugs. Alcocer was alleged to have told the grand
Jury that he was unaware that the Judge, who
later pled guilty to Such Charges, had been using
drugs. (Alcocer, 206 Cal. App. 3d at p. 955) Alcocer retained
an attorney who also represented another person
who had pled guilty to possession of drugs for Sale
and whom the prosecution Stated that it might
call to testify that Alcocer had been present when
that person had Sold drugs to the former Judge. On
those grounds' the prosecutor moved to recuse
retained counsel on the grounds of a Conflict of inte-
rest. The trial Court granted the motion to recuse
Counsel, Concluding that by representing the alleged drug
dealer, the retained attorney "could not

25

adequately Cross-examine him, were he called to testify for the Prosecution. This would prejudice Alcocer." (Ibid) Alcocer sought relief by extraordinary writ, contending that he had been denied representation of Counsel of his Choice. (Id. at pp. 955, 964) The appellate Court agreed, rejecting the People's Contention that ensuring that defendant receive a fair trial" takes precedence over ensuring that a defendant be represented by the lawyer whom he prefers". (I. at p 956). In discussing "the defendant's right to Counsel of his Choice" and the ramifications of Wheat, supra, 486 U.S. 153, the Alcocer Court Stated that while" a lawyer immersed in the Shifting Sands of Conflicting interests may be unable to effectively represent one of all of those interests," that does not mean that we must subordinate the defendant's right to Counsel of his Choice to his right to a Conflict-free attorney. Such a paternalistic treatment of a defendant restricts his Six Amendment right. The choice is up to defendant, provided he is fully informed of his right, and knowingly and intelligently waives them". (Alcocer v Superior Court. Supra, 246. Cal. App. 3d at 956) The Court acknowledged that defendant would not always make a "wise choice".

(Alcocer v. Superior Court)(1988) 206. Cal. App. 3d 951)

26

1  Since in Petitioner's case there has been no
2  Jury verdict within the meaning of the
3  Six Amendment, the premise for harmless-error
4  analysis is absent. Unlike an erroneous Pre-
5  sumption regarding an element of the offense. See
6  Sandstrom v. Montana, 442 US 510, 61 L Ed 2d
7  39, 99 S Ct 2450, A deficient reasonable doubt
8  instruction vitiates all the Jury's factual find-
9  ings. A reviewing court in such a case can
10 only engage in pure speculation- its view of
11 what a reasonable Jury would have done. Wher
12 it does that, the wrong entity Judges
13 the defendant guilty moreover denial of
14 the right to a Jury verdict of guilty
15 beyond a reasonable doubt, the conseq-
16 uences of which are necessarily unquan-
17 tifiable and indeterminate, is certainly
18 A "structural defect in the constitution
19 of the trial mechanism, which defies
20 analysis by "harmless-error standards" under
21 Arizona v. Fulminante, 499 US, 279, 113 L Ed 2d
22 302, 111 S Ct 1246 (opinion of Rehnquist, CJ. for
23 the court), 596 So 2d 177, reversed
24 and remanded. Scalia, J delivered
25 the opinion for A unanimous court.
26 Rehnquist. C.J. filed A concurring opinion
27
28

27

The Jury instructions in Petitioner Sullivan's State-Court trial for first degree murder included a definition of "reasonable doubt" that was essentially identical to the one in Cage v. Louisiana, 498 US. 39,112 L Ed 2d 339,111 S ct 328 (Per Curiam). The Jury entered a verdict of guilty, and Sullivan was sentenced to death. In upholding the conviction on direct appeal, the Supreme Court of Louisiana held that the erroneous instruction was harmless beyond a reasonable doubt. (A)Sullivan's Six Amendment right to Jury trial was denied by the giving of a constitutionally deficient beyond-a reasonable-doubt instruction. The fifth Amendment requirement of Proof beyond a reasonable doubt See, e.g In re Winship, 397 US 358, 364, 25 L Ed 2d 368, 90 S ct 1068, and the Six Amendment requirement that the Jury, rather than the Judge, reach the requisite finding of guilty, are interrelated. The required Jury Verdict is a Verdict of guilty beyond a reasonable doubt. The court's opinion in Cage, which held that an instruction of the Sort given here does not Produce such a Verdict, is Controlling. (b) The giving of a constitutionally errors that require reversal of a conviction, rather than those that are amenable to harmless-error analysis. See Chapman v. California, 386 US 18, 24, 17 L Ed 2d 705. 87 S ct 824, 24 ALR 3d 1065. Consistent with the Jury-trial guarantee, Chapman instructs a reviewing Court to Consider the actual effect of the error on the guilty verdict in the case at hand.

Appeal 1535- reversible error Right to Counsel
Some federal Constitutional errors which are
Structural defects in the Contitution of the
criminal trial Mechanism-Such as deprivation
of the right to Counsel-defy analysis by harmless
error Standards and require the automatic
reversal of A defendant's Conviction, because such
errors infect the entire trial Process.
White and Blackmon, JJ dissented in Part from
this holding - BRECHT V. ABRAHAMSON
                (A93) 507 US 123. L Ed2 353
                                    (Id. 359)

29

1  <u>The Trial Court Had a Duty to Instruct the</u>
2  <u>Jury on the Lesser Included Offense</u>
3  <u>Of Theft in Count 8.</u>

4

5  Under California law, a trial court errs if it fails to
6  instruct, Sua sponte, on all theories of a lesser
7  included offense which find substantial support in
8  the evidence." Such instruction are required when-
9  ever evidence that the defendant is guilty only
10 of the lesser offense is substantial enough to
11 Merit Consideration' by the Jury. Evidence is
12 Substantial, in this context, if a Jury Composed
13 Of reasonable persons could conclude from
14 it that the lesser offense, but not the greater,
15 was committed. (Ibid). The trial court below
16 instructed the Jury on the elements of robbery,
17 as charged in Count 8. (CT 655-657, RT 851-
18 852.) The trial court did not instruct the Jury
19 on theft as a lesser included offense. Theft
20 in whatever from it happens to occur, is a
21 necessarily included offense of robbery grand
22 theft from the person is lesser included
23 offense to robbery], CJER Mandatory Criminal
24 Jury instructions Handbook(CJER) The difference
25 between the two offenses is that robbery
26 has the additional element of a taking by
27 force or fear. Thus, the question before this
28 court is whether or not a Jury composed of

30

1  reasonable persons could have concluded that, with
2  respect to Count 8, Mr. Baylis was guilty of theft
3  rather than robbery. For two reasons, Mr. Baylis
4  submits that this question must be answered
5  in the affirmative. First, the jury could reason
6  ably have concluded that the taking of the
7  $17 was not accomplished by force or fear. Jane
8  Doe testified that when she and Mr. Baylis got
9  to the apartment, he told her to take her clothes
10  off, which she did (RT 582-583) After all but one
11  of the sexual assaults had been committed, Mr.
12  Baylis told her to put her clothes back on and
13  handed them to her.(RT 588-590.) Jane Doe
14  testified that she had money in her pockets
15  when Mr. Baylis took her to the apartment and
16  that when Mr. Baylis "was handing me my pants
17  she heard -- in the prosecutor's words- what
18  sounded like the defendant going through her
19  pockets." (RT 600-601.) And it was not until after
20  this all happened, again using the words of the
21  prosecutor, that Jane Doe discovered that about $17
22  was missing from her pants. (RT 601.) As the fifth
23  District Court of Appeal has recently acknowledged:
24  There is rule that taking property without force
25  from a person found unconscious, or extracting
26  property stealthily and without force from a conscious
27  person who remains unaware, is not robbery."
28  Second, even if no reasonable juror could doubt that

31

1 the taking of Jane Doe's $17 was accomplished by
2 force or fear, there was ample room for doubt as to
3 whether Mr. Baylis formed an intent to steal before
4 or during, rather than after, the application of force.
5 If intent to steal arose only after the victim was
6 assaulted, the robbery element of stealing by force or
7 fear is absent. In Rodriguez v. Superior Court (1984)
8 159 Cal. App. 3d 821, which involved facts indistinguis-
9 hable (for purposes) from those of the instant case,
10 Division Three of this court went even farther than
11 Mr. Baylis urges here. The court held that the defen-
12 dant could not be held to answer on robbery charges.
13 The defendant in Rodriguez forced a woman, with her
14 purse, into the car he was driving. He drove to a
15 baseball field and grabbed her out of the car; the
16 purse stayed behind in the car. He raped her on
17 the baseball field, then told her to wait there.
18 He returned to the car and drove off. The woman
19 returned to where the car had been and did
20 not see her purse.(Id. at pp. 823-824) After a
21 magistrate held the Rodriguez defendant to answer
22 for robbery, the defendant sought writ relief, arguing
23 that any force or fear which took place occurred
24 in connection with the rape and not with the
25 taking of the victim's purse." (Rodriguez, supra,
26 159 Cal. App. 3d at p. 824) The court of Appeal agreed
27 (Rodriguez v. Superior Court, supra, 159 Cal. App. 3d
28 at p. 827) The evidence in the instant case

1 gave the jury no reason to believe that Mr. Baylis
2 formed an intent to steal money from Jane Doe
3 before he applied force to her in order to
4 accomplish the sex offenses. Just as the Magistrate
5 in Rodriquez had no reason to believe that the de-
6 fendant framed an intent to steal the victim's purse
7 before he forced her out of the car to rape her.
8 At the very least, a jury composed of reasonable
9 persons could have concluded that Mr. Baylis did
10 not form the intent to steal before the application
11 of force and that, therefore, he was guilty of
12 theft rather than robbery. The trial court erred
13 in failing to instruct the jury on the lesser
14 included offense of theft.

15 (See EXHIBIT (D)

16

17                Conclusion

18 Accordingly Petitioner Requests that the Respondent
19 Allegation has no Merit and that the court rule
20 in favor of Petitioner and give Petitioner a
21 reversel on his Writ of Habeas Corpus.

22

23 THE PETITIONER WILL REQUEST A EVIDENTARY
24 HEARING ALSO. ON THIS MATTER

25

26

27

28

33

# EXHIBIT COVER PAGE:

Exhibit: _____A_____

Description of this exhibit:

Number of pages of this exhibit: __2__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

__✓__ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

34

**Narrative:**  On the listed date and time (V) Kayembe telephoned HPD advising she seen the (S) vehicle that she was assaulted in. The vehicle was described as a teal Hyundai Elantra Station Wagon occupied by two black males.   Kayembe advised the vehicle was driving away towards Whitman St. from Berry Ave. as HPD Patrol Units responded to the area.

Officer Cowels advised that he located the vehicle and a traffic stop was conducted and its occupants detained.   The occupants were identified as (W)Patrick Baylis and (W) Christopher Wallace via their Calif. Drivers License.  Baylis was the driver of the vehicle and Wallace was seated in the front passenger seat.

I responded to 536 Berry Ave. #1 and contacted Kayembe who relayed the following. Tonight at approximately 2215 hrs. she was standing on her balcony of her apartment and noticed the listed vehicle parked on Berry Ave. near her apartment complex.  She then noticed two black male's get into the car and driver towards Whitman St. She stated the driver of the vehicle appeared to be the (S) which assaulted her.

I transported Baylis and her mother, (W) Pinkney, to the location where the traffic stop had been made and she stated that the vehicle appeared to be the same vehicle used during the assault, however, she did not recognize Baylis or Wallace.

Baylis and Wallace stated they were visiting a friend by the name of Jones at 502 Berry Ave. #32.  I responded to that address and confirmed that Wallace and Baylis had been visiting.   I took a polaroid photograph of Wallace and provided Det. Hernandez with it along with the F.I. cards taken at the scene.  Baylis and Wallace were then allowed to leave.

**Case Status:**  Open.

R. Posey #423   Supplement
Pg 4   97-05652

35

**Narrative:**  The purpose of this supplement is to add more facts to my investigation on 03-21-97.

After the listed vehicle had been stopped, I transported Kayembe to the location of the traffic stop.  When Bayliss was taken out of the back of the Police vehicle for identification purposes, Kayembe became upset and at first thought that he was the suspect which assaulted her.  After Bayliss stood up, I noticed her relax and state, "He looks like him in the face, but the guy that did it is shorter."

It should also be noted that while at the traffic stop, I was advised by other HPD Officers at the scene that Bayliss stated, "I'm not going through this again, I got blamed for Rodney doing this to someone before."

Bayliss was subsequently released at the scene and Kayembe felt sure that Patrick Bayliss was not the person who assaulted her.

R. Posey #423   Supplement Pg 3
03-21-97   97-05652

36

# EXHIBIT COVER PAGE:

Exhibit: B

Description of this exhibit:

Number of pages of this exhibit: 3 pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

37

ENDORSED
# FILED

OCT 24 1997

RONALD G. OVERHOLT, Exec. Off./Clerk
By Tracey Hernandez, Deputy

IN THE MUNICIPAL COURT FOR THE STATE OF CALIFORNIA

OAKLAND-PIEDMONT-EMERYVILLE JUDICIAL DISTRICT

DEPARTMENT NUMBER 16

---oOo---

BEFORE THE HONORABLE CARLOS YNOSTROZA, JUDGE

131292

PEOPLE OF THE STATE OF CALIFORNIA,       No. 415272

    Plaintiff,

                                  F220/USE PC, 2 cts
vs.                                   F245(A)(1) PC
                                   F221/664/U PC
RODNEY BAYLIS,                   F261(A)(2) PC, 4 cts
                                   F288A/USE PC
    Defendant.                   F289(A)/USE PC
_____/     F290(G)(2) PC

PRELIMINARY EXAMINATION
REPORTER'S TRANSCRIPT
AUGUST 27, 1997

APPEARANCES:

FOR THE PEOPLE:           JOHN BROUHARD
                              DEPUTY DISTRICT ATTORNEY

FOR THE DEFENDANT:        ROGER PATTON
                              ASSISTANT PUBLIC DEFENDER

REPORTER:   KENDRA M. MANGELS, CSR No. 7259

```
 1   A.    He had on black pants like jeans, black boots.  He had

 2   on a gray sweater with a hood -- I mean not a hood, a

 3   collar with a zipper, and it had a pocket in the front, and

 4   it was long-sleeved.

 5         THE COURT:  Excuse me.  Read the answer back, please.

 6              (Record read.)

 7         THE COURT:  Thank you.

 8         MR. BROUHARD:  Q.  Did the man have anything on his

 9   face?

10   A.    He had on sunglasses, but they were like the kind the

11   police wear where they look like glasses, but they're not.

12   They have like a little tint to the glasses.

13   Q.    Could you see through the tint to the man's eyes?

14   A.    No.

15   Q.    Were you able to see how the man wore his hair?

16   A.    Yes.

17   Q.    What did you see?

18   A.    He had a low -- low cut where it wasn't complete --

19   where his head wasn't completely balanced where he had a

20   little hair on his head.

21   Q.    Did he have any facial hair?

22   A.    Yes.

23   Q.    What did he have?

24   A.    He had a mustache and a close-cut beard.

25   Q.    Was the mustache close cut or not?

26   A.    No.

27   Q.    Did you know that man?

28   A.    No.
```

39

1  Q.    That man that you saw with the -- that gun on Jackson

2  Street that day, do you see that man in the courtroom here

3  today?

4  A.    Yes.

5  Q.    Could you just point to that man and tell the judge

6  what that man is wearing?

7  A.    He's right there, and he has on a yellow shirt.

8        MR. BROUHARD:   Okay.  Would the record reflect that

9  the witness has indicated the defendant?

10       THE COURT:  The record may show that.

11       MR. BROUHARD:   Q.  You described the way that this man

12  grabbed you with the gun.  Can you tell me what was the

13  very next thing that happened after he grabbed you that

14  way?

15  A.    Well, after he told me to shut up and I didn't say

16  anything, we walked to the driveway of McDonald's and the

17  athletic club, and we walked towards the back of the

18  athletic club.

19  Q.    And why is it that -- well, let me ask you this.  How

20  did you walk there?  Did you walk there on your own, or did

21  the man --

22  A.    He kind of led me.

23  Q.    And what did he do to kind of lead you?

24  A.    He was still holding me around my neck.

25  Q.    What did he do with the gun?

26  A.    It was still in his hand.

27  Q.    And where was the gun in relation to your body?

28  A.    On my cheek.

11

40

# EXHIBIT COVER PAGE:

Exhibit: ___C___

Description of this exhibit:

Number of pages of this exhibit: ___4___ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

__✓__ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

41

1  Q.   DID YOU TALK TO HIM ABOUT THAT TRAFFIC STOP THAT TOOK

2  PLACE THAT NIGHT?

3  A.   I DID.

4  Q.   DID YOU ASK HIM TO PREPARE A SECOND SUPPLEMENTAL REPORT?

5  A.   ONCE HE TOLD ME A LITTLE MORE OF WHAT HAD HAPPENED THAT

6  WASN'T IN THE INITIAL SUPPLEMENT, I DID ASK HIM TO PREPARE A

7  SECOND SUPPLEMENT.  YES, I DID, SIR.

8  Q.   LET ME ASK YOU, DID YOU ASK OFFICER POSEY TO PREPARE A

9  REPORT WHICH SAID THAT THE VICTIM HAD FIRST THOUGHT PATRICK

10 BAYLIS WAS THE PERSON WHO ATTACKED HER BUT THEN SHE RELAXED AND

11 SAID THAT PATRICK BAYLIS LOOKED LIKE HER ATTACKER IN THE FACE

12 BUT THAT HER ATTACKER WAS SHORTER, DID YOU ASK HIM TO WRITE

13 THAT?

14 A.   I ASKED HIM TO WRITE A SUPPLEMENT AS TO WHAT OCCURRED THAT

15 NIGHT BASED ON HIS MEMORY.

16 Q.   DID YOU ASK HIM TO WRITE THAT, WHAT I JUST DESCRIBED TO

17 YOU?

18 A.   I DIDN'T TELL OFFICER POSEY WHAT TO WRITE.  I ASKED HIM TO

19 WRITE A SUPPLEMENT BASED ON WHAT HE SAW OF HIS PHYSICAL

20 OBSERVATIONS OF THE SURVIVOR WHEN SHE OBSERVED APPARENTLY

21 MR. PATRICK BAYLIS.

22 Q.   LET ME ASK YOU IS IT YOUR TESTIMONY THAT OFFICER POSEY

23 TOLD YOU THAT THE VICTIM HAD INITIALLY IDENTIFIED PATRICK

24 BAYLIS BUT HAD THEN RELAXED AND SAID IT LOOKS LIKE HIM IN THE

25 FACE BUT THE GUY WHO DID THIS TO ME IS SHORTER; IS THAT WHAT

26 OFFICER POSEY TOLD YOU?

27 A.   I BELIEVE -- I DON'T KNOW IF HE TOLD ME SHE HAD IDENTIFIED

28 HIM.  I THINK HE RECALLED -- THIS IS LONG MEMORY NOW -- THAT

| | |
|---|---|
| 1 | WHEN SHE ARRIVED AND HE WAS GETTING OUT OF THE CAR, THAT AT |
| 2 | FIRST I BELIEVE SHE SAID IT LOOKED LIKE HIM BUT THEN AS HE GOT |
| 3 | OUT, HE SAID SHE HAD A VERY VISIBLE SIGH OF RELIEF AND MADE |
| 4 | SOME COMMENT ABOUT THAT'S NOT HIM AS IT'S IN QUOTES.  THAT'S |
| 5 | NOT HIM, THE SUSPECT ISN'T THAT TALL. |
| 6 | Q.   AND YOU'RE ATTRIBUTING THAT TO OFFICER POSEY? |
| 7 | A.   ABSOLUTELY. |
| 8 | Q.   OKAY.  DID HE IN FACT WRITE THAT SUPPLEMENTAL REPORT? |
| 9 | A.   HE WROTE A SUPPLEMENTAL REPORT CONCERNING THAT INCIDENT, |
| 10 | YES, SIR. |
| 11 | Q.   AS YOU REQUESTED? |
| 12 | A.   HE WROTE A SUPPLEMENTAL I REQUESTED HIM TO WRITE BASED ON |
| 13 | HIS OBSERVATIONS, YES, SIR. |
| 14 | Q.   ON THE 27TH OF MARCH 1997, DID YOU MEET WITH OFFICER |
| 15 | HEDRICK IN THE PARKING LOT OF THE HAYWARD POLICE DEPARTMENT? |
| 16 | A.   YES, SIR, I DID. |
| 17 | Q.   DID YOU HAVE DISCUSSIONS WITH OFFICER HEDRICK CONCERNING |
| 18 | THIS TRAFFIC STOP? |
| 19 | A.   YES, SIR, I DID. |
| 20 | Q.   DID YOU ASK OFFICER HEDRICK TO WRITE A SUPPLEMENTAL |
| 21 | REPORT? |
| 22 | A.   I DON'T RECALL IF I DID, SIR.  IF I DID, I THINK HE WOULD |
| 23 | HAVE WRITTEN ONE. |
| 24 | Q.   HE DID NOT WRITE A SUPPLEMENTAL REPORT, DID HE? |
| 25 | A.   NOT THAT I'M AWARE OF, NO, SIR. |
| 26 | Q.   NOW, IN YOUR REPORT YOU MENTIONED SOMETHING ABOUT OFFICER |
| 27 | HEDRICK TELLING YOU THAT THE VICTIM HAD ASKED OFFICER POSEY |
| 28 | WHETHER OR NOT PATRICK BAYLIS HAD A CRIPS TATOO; IS THAT RIGHT? |

| | | |
|---|---|---|
| 1 | A. | YES, SIR, I SEE IT ON PAGE 2 OF THE REPORT. |
| 2 | Q. | WHAT WAS THE DESCRIPTION SHE GAVE YOU? |
| 3 | A. | SUBJECT DESCRIPTION BMA. |
| 4 | Q. | WHAT IS THAT? |

5   A.   BLACK MALE ADULT, EARLY THIRTIES, 5'5", HEAVY SET, ABOUT

6   200 POUNDS, FULL BEARD, NEAT, SHORT AND TRIM, SHORT HAIR TO THE

7   SCALP BUT NOT BALD, ROUND FACE WITH BIG PUDGY NOSE, WEARING

8   ROUND AVIATOR GLASSES, DARK BLUE GLASS, SUNGLASSES TYPE, GRAY

9   ZIP-UP SWEATER, LONG SLEEVE, BLACK BAGGY-FIT JEANS, BLACK

10  CONSTRUCTION-TYPE BOOTS.

11  Q.   IN YOUR EXPERIENCE IN INVESTIGATING SEXUAL ASSAULT CASES,

12  IS THAT A FAIRLY DETAILED DESCRIPTION OF AN ASSAILANT?

13  A.   THAT'S ACTUALLY PRETTY GOOD, YES, IT IS.

14  Q.   WHEN EXACTLY DID OFFICER GUZMAN TALK TO THE VICTIM AND

15  TAKE THIS DESCRIPTION FROM HER RELATIVE TO THE ASSAULT ITSELF?

16  A.   IF MEMORY SERVES ME CORRECT, PRETTY CLOSE IN THE TIME THAT

17  SHE WAS FOUND BY A WITNESS ON THE STREET.

18  Q.   SO THIS WOULD HAVE BEEN JUST LATER THE SAME MORNING,

19  SHORTLY AFTER?

20  A.   THE SAME MORNING, YES, SIR.

21  Q.   SHORTLY AFTER THE ASSAULT?

22  A.   YES, SIR, I BELIEVE IT WAS.

23  Q.   INCIDENTLY, DO YOU KNOW HOW TALL RODNEY BAYLIS IS?

24  A.   I BELIEVE HE'S ROUGHLY 5'5", 5'6".  CAN I LOOK AT MY

25  REPORT?

26  Q.   SURE.

27  A.   YES, I DO.

28  Q.   OKAY.  HOW TALL IS RODNEY?

1   A.   BASED ON THE INFORMATION THAT I PUT IN MINE, THAT I

2   BELIEVE I GOT FROM HIM WAS 5'5", 220 POUNDS STOCKY BUILD.

3   Q.   OKAY.  DO YOU KNOW OFF HAND HOW TALL PATRICK BAYLIS IS?

4   A.   I BELIEVE THROUGH MY INVESTIGATION I CAME UP WITH A

5   HEIGHT, YES, SIR.

6   Q.   HOW TALL DO YOUR NOTES REFLECT MR. BAYLIS IS?

7   A.   I BELIEVE 6 FOOT TALL.

8   Q.   JUST FOR COMPARISON, HOW TALL IS JANE DOE?

9   A.   I WANT TO SAY 5'1", 5'2", THAT'S OFF THE TOP OF MY HEAD.

10  SHE'S SHORT.

11  Q.   CHECK PAGE 9 OF YOUR REPORT.

12  A.   MY REPORT?  5'3", 130 POUNDS.

13  Q.   SHE'S 5'3" AND SHE DESCRIBED TO OFFICER GUZMAN THE

14  ASSAILANT BEING JUST A COUPLE INCHES TALLER THAN SHE?

15  A.   THAT'S CORRECT.

16  Q.   OKAY.  YOU SAID SEVERAL TIMES THAT RODNEY BAYLIS IS A

17  REGISTERED SEX OFFENDER; IS THAT RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   THAT'S SOMETHING YOU LEARNED DURING THE COURSE OF YOUR

20  INVESTIGATION?

21  A.   YES, IT IS.

22  Q.   CAN YOU TELL THE JURY WHAT THAT MEANS TO BE A REGISTERED

23  SEX OFFENDER?

24  A.   IT MEANS HE'S BEEN CONVICTED OF A PRIOR SEXUAL ASSAULT AND

25  HAS TO REGISTER AS A SEX OFFENDER IN THE STATE OF CALIFORNIA.

26  Q.   HIS OBLIGATION UNDER THE LAW EVERY YEAR ON HIS BIRTHDAY HE

27  HAS TO TURN HIMSELF INTO A LOCAL POLICE STATION AND REGISTER,

28  CORRECT?

# EXHIBIT COVER PAGE:

Exhibit: ___D___

Description of this exhibit:

Number of pages of this exhibit: ___1___ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

46

## II.   THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO INSTRUCT THE JURY ON THEFT AS A LESSER INCLUDED OFFENSE TO ROBBERY.

### A.   Introduction.

In count 8, Mr. Baylis was charged with and convicted of robbing Jane Doe, in violation of section 211. (CT 571, 629, 693-694.) At trial, Jane Doe testified that after Mr. Baylis left her, she discovered that she was missing $17 from her pants. (RT 601.) Mr. Baylis contends that his conviction of robbery in count 8 must be reversed, because the trial court committed prejudicial error when it did not instruct the jury on the lesser included offense of theft.

### B.   The Trial Court Had a Duty to Instruct the Jury on the Lesser Included Offense of Theft in Count 8.

Under California law, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162; see also *People v. Wickersham* (1982) 32 Cal.3d 307, 323-324.) "[S]uch instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman, supra,* 19 Cal.4th at p. 162.) Evidence is "substantial," in this context, if a jury composed of reasonable persons could conclude from it that the lesser offense, but not the greater, was committed. (*Ibid.*)

The trial court below instructed the jury on the elements of robbery, as charged in count 8. (CT 655-657; RT 851-852.) The trial court did not instruct the jury on theft as a lesser included offense.

"Theft, in whatever form it happens to occur, is a necessarily included offense of robbery." (*People v. Ortega* (1998) 19 Cal.4th 686, 699; see also *People v. Thomas* (2005) 127 Cal.App.4th 368, 372-373 [grand theft from the

60

47

<u>DECLARATION AND PROOF OF SERVICE BY MAIL</u>

I, Patrick Baylis, declare under the penalty of perjury that I am over the age of 18 years, (yes) and not a party, or (yes) am a party to this action, and reside in Solano County, at P.O. Box 4000, Cell # 12-225 ) Vacaville, California. 95696-4000.

That on June , 18 , 200 8 . I submitted to custody officials for inspection, sealing and depositing in the United States Mail, consistent with the "Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the attached hereof:

PETITIONER'S TRAVERSE TO ANSWER

in a fully prepaid envelope, addressed to:

OFFICE OF THE CLERK U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA 450 GOLDEN GATE AVENUE San Francisco, CAlifornia, 94102

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this June , 18 , 200 0 , at CSP-Solano, Vacaville, California. 95696-4000.

Patrick Baylis

DECLARANT

Patrick Baylis - Petitioner

V-31394

C.S.P. Solano

P.O. Box 4000

Vacaville, CA 95696

California State Prison - Solano

Office of The Clerk U.S. District

Northern District of California

450 Golden, Gate AVE

San francisco, CA 94102

RECEIVED M

JUN 2 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LABEL 107R, OCT 1997

PRIORITY
MAIL
UNITED STATES POSTAL

WWW.USPS.GOV

CSP SOLANO
STATE PRISON